EQUAL EMPLOYMENT OPPORTUNITY COMMISSION (U. S. A.), Plaintiff,

v.

PACIFIC PRESS PUBLISHING ASSOCIATION, Defendant.

No. C–77–1619–CBR.

United States District Court, N. D. California.

Dec. 28, 1979.

---

**21.** See page 1284, *supra*.

**22.** See pages 1287–1288, *supra*.

F. Cancino, Chester F. Relyea, John M. Rea, E. E. O. C., San Francisco, Cal., for plaintiff.

Malcolm T. Dungan, James H. Quirk, Melinda S. Collins, Brobeck, Phleger & Harrison, San Francisco, Cal., for defendant.

**MEMORANDUM OF OPINION**

RENFREW, District Judge.

This case presents a difficult and troubling issue, requiring resolution of a confrontation between the state and church in the context of alleged employment discrimination on the basis of sex. Plaintiff Equal Employment Opportunity Commission ("EEOC") brought this suit against Pacific Press Publishing Association ("Press"), a nonprofit corporation affiliated with the Seventh-day Adventist Church, pursuant to § 706(f)(1) and (3) of Title VII, Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. § 2000e–5(f)(1) and (3), charging that Press had deprived an employee, Lorna Tobler ("Tobler"), of equal employment opportunities and otherwise adversely affected her status as an employee because of her sex. Specifically, the EEOC alleges two discriminatory practices: First, a denial to Tobler of head-of-household monetary allowances paid to similarly situated male employees from November 10, 1970, until July 1, 1973,[1] in violation of § 703(a) of Title VII, 42 U.S.C. § 2000e–2(a); and second, discrimination against Tobler for making charges, assisting and participating in investigations under Title VII with resulting discouragement of participation by other employees in Title VII proceedings an violation of § 704(a) of Title VII, 42 U.S.C. § 2000e–3(a). Initially, plaintiff sought damages for Tobler, permanent injunctive relief enjoining Press from in any way discriminating on the basis of sex or because of an employee's participation in Title VII proceedings, and an order requiring Press to implement policies and affirmative action programs to provide equal opportunity for Tobler and other employees who participate in Title VII proceedings. By the time of trial, however, plaintiff narrowed its request for injunctive relief to only that necessary to accomplish the following results:

1. EEOC's complaint alleged disparity in the payment of household allowances from July 2, 1965, through May 23, 1975. In its pretrial statement, however, plaintiff indicates it is asserting a violation of § 703(a) based on discriminatory pay practices only until July 1, 1973, and the parties have stipulated that the initial date of the relevant period is November 30, 1970. The complaint had also alleged as an additional violation of § 703(a) that Press had "den[ied] Tobler pay and promotion above the secretarial level while assigning her duties above that level." Plaintiff dropped this allegation in its pretrial statement.

"(1) Eradicat[ion of] the continuing effects of past retaliation against Lorna Tobler, including but not limited to future letters of reference to potential secular employers, derogatory information concerning her illegal termination in her personnel file, etc.

"(2) Eradicat[ion of] the continuing effects of past retaliation on Press' employees' willingness to petition government agencies for redress or cooperate with government inquiries, including posting a copy of this judgment on Press' bulletin board where EEOC and Department of Labor notices are posted, and noti[fication] that the law requires Press' future compliance with the terms of Section 704(a) of Title VII." Pretrial Statement filed February 17, 1978, pp. 2-3.

This action, filed on July 27, 1977, and consolidated on September 15, 1977, with two actions [2] previously filed against Press, represents but a small part of the complex and protracted litigation which has focused upon the employment practices at Press.

In the first suit that was filed, *Silver v. Pacific Press Publishing Association ("Silver")*, No. C-73-0168-CBR, plaintiff Merikay Silver sought relief on behalf of herself and those women similarly situated charging retaliation under § 704(a) of Title VII, 42 U.S.C. § 2000e-3(a), and alleging the payment of discriminatory gender-based living allowances (the "head-of-household issue"), and her receipt of lower pay than a male colleague doing equivalent work, the latter two both under § 703(a) of Title VII, 42 U.S.C. § 2000e-2(a). The retaliation and head-of-household claims in *Silver* were similar to those the EEOC has alleged in this action *("EEOC (Tobler Charges)")*. On May 22, 1974, this Court conditionally ordered that the *Silver* action proceed as a class action. However, based on the nature of the responses received from the Court-ordered notice procedures expressing great concern about the case proceeding as a class action because of the church/state confrontation issue, the Court on June 13, 1975, decertified the class while granting to those women who had responded affirmatively, or not at all, the right to intervene.[3]

In the interim, on September 20, 1974, the EEOC, pursuant to §§ 706(f)(2), (3), and 706(g) of Title VII, 42 U.S.C. §§ 2000e-5(f)(2), (3), and 2000e-5(g), filed a second action, No. C-74-2025-CBR *("EEOC (Preliminary Relief)")*, this time against Press, General Conference of the Seventh-day Adventists, and two other Seventh-day Adventists institutions,[4] seeking preliminary relief for Silver and Tobler because Press allegedly had threatened to retaliate against them both because of their filing of charges with the EEOC, against Tobler because of her intervening in *Silver*, and against Silver because of her filing of the *Silver* action.[5] Shortly thereafter, Press announced its intention to discharge Silver and Tobler. On February 24, 1975, this Court issued an order temporarily restraining defendants from terminating the two women; renewed that order on March 5, 1975, for an additional ten-day period; and then granted a preliminary injunction on March 25, 1975, requiring Press to refrain from discharging

---

2. After the trial in this action, the EEOC filed on May 18, 1978, another action against Press. That suit, C-78-1090-CBR, was determined to be related to the other three actions on May 22, 1978. Defendant's motion to dismiss or for summary judgment in that action is under submission, and proceedings on plaintiff subsequently filed partial motion for summary judgment have been stayed pending further order of this Court.

3. Although the EEOC requested and was granted the right to intervene in *Silver* only as to the § 704(a) retaliation claim, the court records indicate no individuals have sought intervention.

4. The other two defendants charged in the complaint were the Euro-Africa Division of the General Conference of the Seventh-day Adventists and Staat-Korn Verlag GmbH aka Hamburg Publishing House.

5. Silver and Tobler sought and were granted leave to intervene in the suit. Although the action centered specifically on the claims of these two women, the EEOC sought to restrain retaliatory action against any Press employee who participated in Title VII proceedings.

Silver or Tobler until the *Silver* action was resolved or until the two women no longer held membership in the Seventh-day Adventist Church, a prerequisite for employment at Press.[6] On appeal, the Court of Appeals for the Ninth Circuit reversed the order granting the preliminary injunction, holding that the district court could not grant preliminary relief under § 706(f)(2) since that section was only applicable during the pendency of EEOC administrative proceedings.[7] This Court then dismissed *EEOC (Preliminary Relief)* on July 23, 1976.

The instant action and *Silver* were set for consolidated trial in mid-February, 1978, but prior thereto, both cases were settled. However, a dispute about the terms of the settlement in this action subsequently arose, and the matter was tried to the Court on April 27, 1978. Only two witnesses, Lorna Tobler and William Muir, Treasurer of Press, testified at trial, and their testimony focused almost exclusively on the issue of damages. The parties did not call any witnesses to testify on the issue of liability and relied instead upon the submitted record relevant to that phase of this case.[8]

Throughout the litigation in this and the related Press cases, defendants have asserted that the First Amendment and the cases decided thereunder exempt Press's employment practices from regulation under Title VII. Following the filing of post-trial briefs on both the First Amendment and the damages issues and post-trial oral argument on the constitutional issue, *EEOC (Tobler Charges)* was taken under submission. However, the Court indicated it would not be decided until the First Amendment issues in the most recently filed case, No. C-78-1090-CBR, had been addressed by the

parties. During the course of proceedings in that case, the Court indicated it desired to withhold judgment until the Supreme Court decided *NLRB v. Catholic Bishop of Chicago* in which certiorari had been granted during the preceding term. *See* 434 U.S. 1061, 98 S.Ct. 1231, 55 L.Ed.2d 760 (1978). Following the issuance of the Supreme Court opinion in that case on March 21, 1979, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533, this Court called for further briefing on the effect of that decision on the Press cases still pending before it.

Upon consideration of all the evidence, the voluminous record herein, and the extensive argument of counsel, the Court renders this Memorandum of Opinion, which shall serve as the Court's Findings of Fact and Conclusions of Law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

## BACKGROUND OF THE CASE

Plaintiff EEOC is an agency of the United States Government charged with the administration, interpretation, and enforcement of Title VII, Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* Defendant Press, a nonprofit corporation incorporated under California law, is a Seventh-day Adventist affiliated publishing house which engages in the business of publishing, printing, advertising, and selling religious and religiously oriented materials for the purpose of carrying out the church's denomination work. These materials are sold throughout the United States and overseas. At all times pertinent hereto, Press has required its employees[9] to be members in good standing of the Seventh-day Adventist Church.

6. *EEOC v. Pacific Press Pub. Ass'n,* 12 F.E.P. Cases 1307, 1309–1310 (N.D.Cal.1975). In this order, the Court also dismissed the two non-American defendants over which it said it could not assert jurisdiction.

7. *Equal Employment Opportunity Commission v. Pacific Press Publishing Association,* 535 F.2d 1182, 1187 (9 Cir. 1976).

8. The parties had previously included by stipulation various portions of the *Silver* record into

*EEOC (Preliminary Relief)* and by further pretrial stipulation incorporated those portions of *Silver* as well as additional parts of the record in *EEOC (Preliminary Relief)* into the record in this case.

9. It is undisputed that during the relevant period Press has employed more than fifteen employees for each working day in each of twenty or more calendar weeks per year.

The Seventh-day Adventist Church is a recognized Christian denomination and is distinguished from other Christian denominations by the two aspects of its faith which gives the church its name. Its basic doctrines are completely consistent with the policy set forth in Title VII of equal employment opportunity and equal compensation for men and women. The governing body of the church is the General Conference of Seventh-day Adventists, an unincorporated association. The term "General Conference" subsumes several different organizational entities. The General Conference in Session, a meeting of all members of the General Conference which convenes quinquennially, is the highest authority in the denomination, and is the only body empowered to alter the structure of the church or to change doctrine. Between the quinquennial sessions of the General Conference, the General Conference Executive Committee, also known as the General Conference Committee, has complete administrative powers. The General Conference Committee itself operates in three ways. First, there are two annual meetings of the entire Committee, known as the Autumn Council and the Spring Meeting. Second, a majority of the entire General Conference Committee may transact denominational business of any nature at any time or place as long as the President or a General Vice President of the General Conference is present. Finally, weekly or more frequent meetings requiring only fifteen members, at least one of whom must be a General Conference officer, are held at General Conference Headquarters in Washington, D.C. It is in this third type of proceeding that the day-to-day administrative decisions of the church are made.

The relationship between these various entities and the exercise of decisional authority in church disputes is described as follows in the *Seventh-day Adventist Church Manual*:

" * * * [I]t is therefore understood that all subordinate organizations and institutions throughout the world will recognize the General Conference in session, and the Executive Committee between sessions, as the highest authority, under God, among us. When differences arise in or between organizations and institutions, appeal to the next higher organization is proper till it reaches the General Conference in session, or the Executive Committee at the Annual Council. During the interim between these sessions the Executive Committee shall constitute the body of final authority on all questions where a difference of viewpoint may develop. The committee's decision may be reviewed at a session of the General Conference or at an Annual Council of the Executive Committee." General Conference of Seventh-day Adventists, *Seventh-day Adventist Church Manual* 48 (rev.ed.1976) ("*Manual*").

In the Seventh-day Adventist organization structure, Press and the other organs through which the ministry of the church is carried out, *e.g.*, schools, hospitals, and colleges, are denominated "institutions".

The *Manual* describes the structure or the polity of its church as "representative." The *Manual* defines this term as follows at page 46:

" * * * [T]he form of church government which recognizes that authority in the church rests in the church membership, with executive responsibility delegated to representative bodies and officers for the governing of the church. This form of church government recognizes also the equality of the ordination of the entire ministry. The representative form of church government is that which prevails in the Seventh-day Adventist Church."

The *Manual* states that the "representative" form is but one of the "four generally recognized forms of church government," listing "episcopal," "papal," and "independent" as the others.[10] Other Seventh-day

10. The *Manual* defines these other forms as follows at p. 46:

"1. Episcopal—the form of church government by bishops, usually with three orders of ministers, as bishops, priests, and deacons.

Adventist documents distinguish the "representative" polity from the other forms in much greater detail,[11] concluding it is a hybrid form of the presbyterian and congregational polities. Although the General Conference in Session is referred to as the "highest authority," none of the official Seventh-day Adventist documents refer to the church as "hierarchical."

In fact, Tobler, as a lifelong member who had also worked in Seventh-day Adventist institutions for twenty-five years, indicated that she had frequently heard the term "hierarchy" used among Seventh-day Adventists in reference to the Roman Catholic system of which she had always been taught that Seventh-day Adventists strongly disapproved. Floyd Rittenhouse, former President of Pacific Union College and of Andrews University, which includes the only Seventh-day Adventist seminary in the United States, also testified during the hearing on EEOC's request for a prelimi-

nary injunction that he had never heard the Seventh-day Adventist denomination characterized as a "hierarchical" church.

Membership in the Seventh-day Adventist denomination is held almost without exception through a local church congregation, which has principal, if not exclusive, jurisdiction for disciplining individual church members for religious reasons.[12] The two types of discipline which the church may impose are (1) censure, a temporary removal from an erring member of the privileges of voting, giving religious instruction, and holding church office, but not sharing in worship activities, and (2) the more drastic disfellowshipping, an expulsion from membership.[13] Members may be disciplined only after their local congregations have voted on the matter. On the issue of church discipline, Seventh-day Adventist bodies larger than the local congregation have but a limited appellate role.[14] In ear-

"2. Papal—the form of church government in which the supreme authority is vested in the Pope. From him the church is governed by cardinals, archbishops, bishops, and priests. The local church or individual member has no authority in church administration.

"3. Independent—the form of church polity that makes the local church congregation supreme and final within its own domain. This is usually referred to as congregationalism."

11. The *Seventh-day Adventist Encyclopedia* describes the church's polity by comparison to the historical evolution of the organizational forms of other Christian churches:

"As the church expanded rapidly in the postapostolic period, and as churches united in given areas, the 'overseers,' or bishops, assumed wider powers, and in time archbishops appeared, exercising still wider authority. The papal system of church government was the outcome. The bishop of Rome held that his peculiar authority rested on divine origin and sanction. This system has also been called *monarchical* or *hierarchical*. In it the supreme power is vested in the pope, who is the head of the various orders of priesthood.

"Other systems of church government that developed were:

"1. The congregational system, sometimes called 'independent.' It has the highest powers residing in the local congregation. No other authority can legislate for it or direct its life.

"2. The presbyterian system. This provides for government by elected representatives, by teaching elders (ministers) and by ruling elders (laymen), functioning in such representative

bodies as presbyteries, synods, and a general assembly as the supreme governing body.

"3. The episcopal system. This centers in the bishops, who are successors of the apostles and have governing power in the church.

"The polity of the SDA Church contains both presbyterian and congregational elements. Its authority springs from the members, whose representatives govern through a five-stage organization—local *church, *conference, *union, *division, and *General Conference. Beyond the local church level there is limited lay representation in the governing bodies, but the local *church in which every member has a vote, has distinct prerogatives of its own." Review and Herald Publishing Assoc., *Seventh-day Adventist Encyclopedia* (rev.ed.1976) 300.

12. In situations in which there is no local church building or organization, membership is held through the local conference. These members would be disciplined by the local conference church and not by a local church congregation.

13. The *Manual* lists "[i]nstigat[ion] or continu[ation] of legal action against the church or any of its organizations or institutions" as a reason for which a local church shall discipline a member. *Manual* at 248.

14. The Manual describes a disciplined member's right to appeal for reinstatement:

"In a case where the church officers refuse to consider the application for reinstatement from an expelled member, such an individual

lier proceedings on the request for a preliminary injunction, Neal Wilson, Vice-President of the General Conference, expressed the opinion that the General Conference could transmit to a congregation through intermediate church bodies a "recommendation" that an erring member be disfellowshipped. He did not suggest, however, that this "recommendation" would displace the authority the local congregation exercises with regard to disfellowshipping. Certainly, the *Manual* gives no power to Press to determine qualifications for church membership or to impose religious discipline.

Throughout her employment at Press, Tobler was a member of the Seventh-day Adventist Church, and she maintained her membership throughout this litigation. Indeed, she received a certificate from her local congregation on January 10, 1977, recommending a transfer of church membership to the Seventh-day Adventist Church in Hamburg, Germany. According to the *Manual*, a church should never issue a "letter of transfer" to a member who is under discipline. At no time was she an ordained minister.

Tobler began work at Press's Mountain View, California offices in 1960 and remained until her termination as an employee on May 29, 1975.[15] Prior thereto, she had worked for ten years as a secretary at four other Adventist-affiliated employers. For her first year at Press, Tobler served as a secretary in the accounting office; thereafter, until the time of her discharge, she was an editorial secretary to the editor of *Signs of the Times*, a monthly magazine published by Press.

Tobler's duties initially and for much of her time in the editorial department at Press involved not only secretarial, but also administrative and discretionary duties.[16] On or about November 7, 1972, she filed her first charge of sex discrimination with the EEOC alleging unequal compensation for women, and shortly thereafter, she began to participate in proceedings centering on similar charges filed by her co-worker Merikay Silver. Tobler filed additional charges with the EEOC against Press on October 19, 1973, and January 17, 1974.[17] Prior to her filing of charges and the commencement of the *Silver* action, Tobler had re-

has a right to appeal to the church for a hearing. The church should not neglect or refuse to grant such a hearing. If it does, the individual has the right to appeal for a hearing to the executive committee of the conference in which the church is located. If, after a full and impartial hearing, the conference committee is satisfied that an injustice is being inflicted by the church, the committee may recommend the reinstatement of the expelled member. But if he is still refused membership by that church, then the committee may recommend him to membership in some other church. On the other hand, if it finds good grounds for sustaining the church in refusing to reinstate the member, it will so record its decision. *Manual* at 255.

15. As noted *supra* at pp. 1294–1295, this Court had enjoined Press from discharging Tobler on March 25, 1975. The injunction was dissolved by the Ninth Circuit on May 12, 1975. Tobler was discharged shortly thereafter on May 29, 1975.

16. Tobler described her duties since she commenced work as an editorial secretary as having included the following tasks:

"a. Evaluating manuscripts submitted for publication in the SIGNS OF THE TIMES, re-

turning those that are unsuitable, and making a report to the editor on those that are usable;

"b. Gathering source material for editorial purposes;

"c. Researching articles for publication in the SIGNS OF THE TIMES;

"d. Writing a news column for the SIGNS OF THE TIMES;

"e. Preparing other SIGNS copy, such as, "Test Your Bible Knowledge;"

"f. Handling queries on SIGNS copy as it proceeds through the factory from the copy editors, art department, typeroom, camera-ready copy department, litho department, and the pressroom;

"g. Checking pageproofs, camera-ready copy, and blueline stages of each issue, and color key proofs of the cover;

"h. Handling correspondence, some dictated, some on my own initiative;

"i. Handling all other routine administrative aspects of the office[.]" Affidavit of Lorna Tobler filed February 18, 1975, at p. 2.

17. The charges were sent to the California Fair Employment Practices Commission, which waived jurisdiction. EEOC's attempt to conciliate Tobler's individual claims failed, and, as noted *supra*, it brought this action on July 27, 1977.

peatedly communicated with the officers and managing agents of Press regarding its policy of paying women lower living allowances than those granted to similarly situated male employees.

Tobler stated that once Press had notice of her actual involvement in the *Silver* case, it changed the nature of her job such that by June, 1974, it consisted primarily of clerical tasks and few of the discretionary and administrative responsibilities previously assigned to her. In November 1974, Tobler intervened in *EEOC (Preliminary Relief)*. By the end of 1974, Tobler's last remaining non-clerical responsibility, preparation of a regularly featured column in *Signs of the Times* entitled "What's Going On" had been removed. In descriptions of Tobler's duties in August and December, 1974 her supervisor, Lawrence Maxwell, indicated they were purely clerical.[18]

With regard to the substance of Tobler's complaints to the EEOC, Press admits that until July 1, 1973, it paid Tobler, as a married female employee, a lesser rental allowance than if she had been a married male employee. This basis of compensation resulted from Press's adoption of wage scales which were recommended by the General Conference and which differentiated among employees on the basis of sex and marital status. Under the scale, married men received a higher rental allowance than single men of equivalent seniority, who in turn received a higher rental allowance than female employees of equivalent tenure, regardless of their marital status.[19] Press

---

18. As of August, 1974, Maxwell described Tobler's job as follows:

"She opens the mail; she returns poetry and manuscripts, which are totally and evidently useless.

    *    *    *    *    *    *

"* * * With a rejection slip. Anything that requires value judgment she is to place on my desk. She types letters that I dictate; she types manuscripts; she answers the phone; she will occasionally place a phone call, when requested." Deposition of Lawrence Maxwell filed January 24, 1975, in *EEOC (Preliminary Relief)* and incorporated in *EEOC (Tobler Charges)* by stipulation of the parties filed February 17, 1978, at Volume I, p. 17.

The following description, which Maxwell gave in December, 1974, also indicates her role was seen as substantially secretarial:

"For the last several years one of the PPPA [Press] employees working under my supervision has been Mrs. Lorna Tobler, whose job title is Editorial Secretary and whose duties include handling all of my dictation, correspondence, filing and related secretarial requirements. In addition, Mrs. Tobler has prepared, under my supervision, a regularly featured column in the *Signs* entitled "What's Going On?" Affidavit of Lawrence Maxwell filed December 3, 1974, in *EEOC (Preliminary Relief)* and incorporated into *EEOC (Tobler Charges)* by stipulation of the parties filed February 17, 1978, at ¶ 2, p. 2.

19. In greater detail, the rental allowance scales were as follows:

From July 1, 1970, to June 30, 1972, Press paid its

| | |
|---|---|
| Married male employees | $1.00/hour |
| Single male employees | $ .50–.70/hour |
| Married female employees | $ .30–.50/hour |
| Single female employees | $ .30–.50/hour |

From July 1, 1972, to December 31, 1972, Press paid its

| | |
|---|---|
| Married male employees | $1.09/hour |
| Single male employees | $ .55–.76/hour |
| Married female employees | $ .33–.55/hour |
| Single female employees | $ .30–.55/hour |

From January 1, 1973, to June 30, 1973, Press paid its

| | |
|---|---|
| Married male employees | $1.09/hour |
| Single male employees | $ .55–.76/hour |
| Married female employees (except editorial assistants who received up to $1.00/hour) | $ .33–.55/hour |
| Single female employees (except editorial assistants who received up to $1.00/hour) | $ .33–.55/hour |

This summary reflects a compilation of information in Press's wage scales, which are organized according to substantive job classification, and information in an admission by Press that the job categories, with the exception of three individual cases during the period 1970 to 1973, were staffed exclusively with employees of either one sex or the other.

It should be noted that in the last six months before Press ceased granting unequal head-of-household rental allowances to male and female employees, Tobler's allowance was changed from that given an editorial secretary to a much higher one granted an editorial assistant. Press had established this higher compensation level effective January 1, 1973, after a Department of Labor investigation concluded that there was one female employee doing substantially the same type of work at a lower hourly rate than a male classified as an editorial assistant. Apparently, Tobler was one of a

also admits that Tobler, because of her status as a married female employee, did not receive an automobile insurance allowance paid to married male employees and single male and female employees in 1971 and 1972. Neither did she receive annual utility allowances received by married men with equivalent seniority.

On February 14, 1975, the General Conference Committee passed a resolution recommending that Tobler as well as her co-worker Merikay Silver be terminated from employment at Press and that the action be reported to their local churches. The resolution was a determination by the General Conference Committee that employees of church institutions must meet the highest standards in adherence to Bible teachings and fidelity to church authority, and that Tobler and Silver did not meet these standards because they had "sued the Seventh-day Adventist Church" and were "at variance with the church and unresponsive to spiritual counsel." Pursuant to this recommendation of the General Conference Committee, and it constituted no more than a recommendation, the Executive Committee of Press voted on February 19, 1975, to terminate the employment of Tobler and Silver effective February 21, 1975.

It is manifestly clear that Press terminated Tobler's employment as retaliation for her opposition to practices she believed unlawful under Title VII and for her filing charges, testifying, assisting, and participating in investigations and proceedings under Title VII.[20] This decision to terminate Tobler was not rendered by an ecclesiastical tribunal on a church matter. Neither did the highest authority of the Seventh-day Adventist Church ever take action with regard to Tobler's discharge. Press admits that although the General Conference in Session did meet in Vienna after the events in question had occurred and did discuss the "principle and policy applicable to the type of problem encountered in Mrs. Tobler's case" (Plaintiff's Exhibit 18 admitted at trial herein), the Tobler dismissal had not been the subject of any official or final decision by that body. The matter was also discussed at the 1975 and 1976 Annual Councils, but no action was taken.

After her discharge and until the time she assumed full-time employment in January, 1978, Tobler applied for work with over twenty employers in this country. Over the course of this 2½ year period she sought employment by going to the San Jose unemployment office, following up referrals from that office, looking at newspaper advertisements, and making inquiries among friends. She indicated she limited her search to secretarial opportunities and also sought work with an employer who would accommodate her need to observe the Sabbath. She also stated that other points

few female employees who Press thought might be so classified based on their work as of early 1973. The fact that in early 1973 she was compensated for allowances as an editorial assistant in no way negates the fact that as of early 1975 her labors were exclusively secretarial.

**20.** Plaintiff has argued that the Court's prior finding of retaliation in *EEOC (Preliminary Relief)* estops Press from disputing, and the Court from re-examining, whether Silver and Tobler were terminated because of their participation in Title VII proceedings. In support of this argument, the EEOC adds that, given the narrow procedural basis for the Ninth Circuit Court of Appeals' reversal of the preliminary injunction issued in that case, this Court's finding relevant to the retaliatory discharge issue has not been reversed or disapproved on appeal.

The Court's reconsideration of the merits of the retaliation charge demonstrates that it finds these arguments unavailing. It is well settled that "[t]he decision of both the trial and appellate court on whether to grant or deny a temporary injunction does not preclude the parties in any way from litigating the merits of the case." 11 Wright & Miller, Federal Practice and Procedure, Civil § 2962 at 630–631 (1973). *See, e. g., Berrigan v. Sigler,* 162 U.S.App.D.C. 378, 382, 499 F.2d 514, 518 (D.C.Cir. 1974); *Bursten v. Phillips,* 351 F.2d 616 (9 Cir. 1965); *Ross-Whitney Corp. v. Smith Kline & French Laboratories,* 207 F.2d 190, 194 (9 Cir. 1953). *A fortiori,* prior findings should not be given estoppel effect in an instance such as in this case, in which the findings were rendered not in the earlier stage of the same proceeding but were issued in a different, though related, case, one which was dismissed on the merits before the actions were consolidated pursuant to Rule 42(a) of the Federal Rules of Civil Procedure.

which were raised in some of her interviews, and which might have affected her job-hunting success, were her interest in returning to Press if reinstated and her desire to obtain flexible hours to allow her an opportunity to continue her college studies.

Between the date of her discharge and the commencement of trial, Tobler made three trips to visit her husband who had transferred to Seventh-day Adventist affiliated publishing houses in Europe. Two of the visits, those in July, 1975, and August, 1977, were approximately one month long. During the first, she made limited inquiries about the availability of work. At the time of her termination at Press, Tobler was entitled to four weeks' vacation per year. She made one more extended visit to Europe joining her husband in September, 1975, in Germany, moving with him to his new job in Switzerland at the end of the year, and returning by herself to California in the summer of 1976. During this period, she testified that, because of knowledge of her husband's impending transfer to Switzerland, she made little effort to secure employment in Germany. In Switzerland, not only language problems but also difficulties in obtaining a work permit or certification as an English teacher hindered Tobler's search for employment.

In the fall of 1976, Tobler began part-time secretarial work with a small law firm. In 1977, she accepted additional part-time work with a local commission studying the status of women. Her work with the law firm changed to full-time employment in January, 1978, when one of the two full-time secretaries left the firm. Tobler indicated at trial that, if at any time up until that date Press had offered to reinstate her, she would have accepted their offer. The parties stipulated prior to trial that monetary relief in the amount of $29,571 would be due to Tobler on account of her receipt of lower living allowances and her lost back pay if the Court should find that Press's acts charged in the complaint violated Title VII.[21]

## APPLICABLE LAW [22]

Since the initiation of this action, Press, in objecting to EEOC regulation of its employment practices, has relied upon a First Amendment defense which incorporated several arguments. Principally, Press has argued that Title VII, which it describes as a statute enacted primarily as a regulation of commerce, cannot be applied to an institution such as Press, which it characterizes as "pervasively religious," for four reasons: (1) such regulation of religious institutions violates the free exercise clause since it requires the institution to subordinate its beliefs to commands of civil authority, (2) such regulation violates the establishment clause as it has a primary effect inhibitory to religious activity and fostering governmental entanglement with religion, (3) such regulation violates both clauses by interfering with the decisions of the church bodies as to the relationships between the church and its workers, and (4) the Bill of Rights was intended to be a limitation on the powers granted in the body of the Constitution, including the Commerce Clause. Furthermore, Press had argued that these constitu-

21. Absent whatever adjustment the Court might choose to make for interest or inflation, this figure reflects the following computations:

| | | |
|---|---|---|
| Utilities allowance (11/10/70–6/30/73) | $ 325 | |
| Rent allowance (11/10/70–6/30/73) | 2,759 | |
| Auto insurance (4/71 and 4/72) | 80 | |
| Total of living allowances | | $ 3,164 |
| Base pay (6/1/75–2/28/78) had Tobler not been terminated | 27,477 | |
| Fringe benefits other than pension (6/1/75–2/28/78) | 2,298 | |
| | 29,775 | |
| Less Tobler interim earnings (6/1/75–2/28/78) | 3,368 | |
| Total of termination wage losses | | $26,407 |

In addition, the parties stipulated that $3,256.20 representing back pension payments that would have been made on Tobler's behalf would be due and owing to the General Conference Sustentation Fund.

22. The Court has jurisdiction of this action under § 706(f) of Title VII, 42 U.S.C. § 2000e–5(f), and 28 U.S.C. §§ 1331 and 1343(4).

tional defenses should be given decisional priority since the maintenance and prosecution of the suit were in themselves unconstitutional as excessive governmental intrusion in religious affairs. After the Supreme Court's decision in *NLRB v. Catholic Bishop of Chicago,* 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979), Press conceded that the constitutional issues did not have to be reached before determining whether the case could be disposed of on statutory grounds. Following the teaching of *Catholic Bishop,* this Court turns first to the applicability of Title VII to the instant suit.

### I. *Applicability of Title VII to the Employer-Employee Relationship between Tobler and Press*

In holding that the National Labor Relations Act does not give the National Labor Relations Board jurisdiction over teachers in church-operated schools offering both religious and secular subjects, the Supreme Court relied upon a canon of statutory construction requiring " ' "the affirmative intention of the Congress clearly expressed" ' " to grant jurisdiction, 99 S.Ct. at 1319 (*quoting McCulloch v. Sociedad Nacional de Marineros de Honduras,* 372 U.S. 10, 21–22, 83 S.Ct. 671, 9 L.Ed.2d 547 (1963), *quoting Benz v. Compania Naviera Hidalgo,* 353 U.S. 138, 147, 77 S.Ct. 699, 1 L.Ed.2d 709 (1957)), once a "narrow inquiry * * [indicates] the exercise of the Board's jurisdiction presents a significant risk that the First Amendment [would] be infringed." 99 S.Ct. at 1320. In conducting its preliminary "narrow inquiry," the Court recognized "the critical and unique role of the teacher in fulfilling the mission of a church-operated school, *id.* at 1319, and observed that in part because of this role the Board's actions would exceed the resolution of factual issues. *Id.* at 1319–1320. In investigating actions which religious leaders would no doubt continue to claim were mandated by their religious creeds, the Board, according to the Court, would have to assess the good faith of the clergy-administrators' positions and its relationship to the schools' religious missions. In addition, in determining what constituted "terms and condi-

tions" of employment under 29 U.S.C. § 158(d), the Board could not avoid encroachment upon management in schools which " 'involve substantial religious activity and purpose,' " *id.* at 1320, *quoting Lemon v. Kurtzman,* 403 U.S. 602, 616, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). The resulting church-state entanglement would create sufficiently "serious First Amendment questions," 99 S.Ct. at 1320, to require the "affirmative intention of Congress" to confer jurisdiction.

In its examination of the legislative history of the National Labor Relations Act, the Labor Management Relations Act, and amendments thereto adopted in 1974, the Court found such intention absent. *Id.* at 1320–1322. Accordingly, the Court found jurisdiction wanting and avoided a ruling upon what degree of church-state entanglement would be impermissibly excessive under the circumstances.

In making a similar preliminary inquiry into whether the church-state entanglement in the instant case presents a significant risk of infringing upon First Amendment freedoms, this Court notes that the facts here are somewhat distinguishable from those in *Catholic Bishop.* Specifically, these differences, which prompt a conclusion of a lesser risk, include the fact that Tobler's clerical duties were not as intimately connected to the institution's religious mission as were those of the parochial teachers in *Catholic Bishop.* The investigation of discriminatory pay practices does not turn on motive and consequently does not intrude upon religious belief. Finally, EEOC jurisdiction is triggered only when it has reason to believe as a result of a complaint by a person aggrieved or by a member of the EEOC that there has been a discriminatory employment practice. It does not involve the type of on-going supervision exercised by the N.L.R.B. after there has been a duly certified union election. Although these differences indicate that the threshold finding of a risk of entanglement mandated by *Catholic Bishop* may not be as great in the instant case, they certainly do not indicate whether or not the entanglement is exces-

sive. Nonetheless, the Court still finds the risk sufficiently significant to require a demonstration of "the affirmative intention of Congress clearly expressed" that Title VII apply to religiously affiliated publishing houses.

Section 702 of Title VII, 42 U.S.C. § 2000e–1, provides the following exemption for religious organizations:

"This subchapter shall not apply * * to a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities."

The legislative history of § 702's adoption in 1964 as well as the amendments added in 1972 clearly reveal that Congress intended that § 702 permits a religious institution to discriminate only in favor of co-religionists and that, therefore, the EEOC has jurisdiction over charges of racial, sexual, and ethnic discrimination brought against entities such as Press.

In 1963, the original version of the exemption which emerged from the House Judiciary Committee as H.R. 7152 contained the following clause exempting all employees of a religious corporation:

"Sec. 703. This title shall not apply to an employer with respect to the employment of aliens outside any State, or to a religious corporation, association, or society." H.R.Rep. No. 914, 88th Cong., 1st Sess. 10 (1963), reprinted in EEOC, Legislative History of Titles VII and XI of Civil Rights Act of 1964 at 2010 (1965) ("1964 Legis. Hist.") U.S.Code Cong. & Admin.News 1964, p. 2355.

H.R. 7152, which was the subject of extensive discussion in the House Judiciary Committee's report and which was passed

by the House, was modified substantially in a substitute measure proposed by Senators Humphrey and Dirksen and adopted by the Senate. The substitute bill did not go through the usual committee procedures; rather, it was worked out in informal bipartisan conferences. Therefore, there is no committee report on the bill considered by the Senate. Since the House then adopted the Senate bill without change, there was no Senate-House conference report. The best available explanations on the intent behind the changes made by the Senate in the House bill are the comments made by Senators Humphrey and Dirksen at the beginning of the debate on the Senate floor. *See* "Congressional Debate on Titles VII and XI Introduction," in 1964 Legis.Hist. at 3001.

The Senate substitute amendment narrowed the broad exemption for religious organizations in § 703 of Title VII as proposed by H.R. 7152. Senator Humphrey explained this change:

"Section 704—formerly 703—has been amended to limit the general exemption of religious groups to those practices relating to the employment of individuals of a particular religion to perform work connected with the employer's religious activities, and to extend the exemption to private educational institutions with respect to the employment of individuals to perform work connected with the educational activities of such institutions." Statement of Senator Humphrey, June 4, 1964, *id.* at 3004.

Senator Dirksen made similar remarks [23] and introduced into the record the following annotated version of the House bill in which italics indicate the limiting language added to the exemption by the Senate substitute proposal:

---

**23.** Senator Dirksen's comments describing the section, which overnight apparently had been renumbered § 703, are as follows:

"Section 703 (renumbered 702): The general exemption of a religious corporation, association or society from this title of the bill is limited by the amendment to the employment of individuals of a particular religion to per-

form work connected with its religious activities. A similar exemption is provided for an educational institution with respect to the employment of individuals to perform work connected with the educational activities of the institution." Statement of Senator Dirksen, June 5, 1964, in 1964 Legis.Hist. at 3017.

Sec. [703] 702. This title shall not apply to an employer with respect to the employment of aliens outside any State, or to a religious corporation, association, or society[.] *with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, or society of its religious activities or to an educational institution with respect to the employment of individuals to perform work connected with the educational activities of such institution.*" Annotated copy of House-passed Civil Rights Bill in 1964 Legis.Hist. at 3050.

Amendments introduced on June 6, 1964, by Senators Clark and Case offered the Senate an opportunity to revert to the blanket exemption for religious organizations contained in the House bill. The Clark-Case substitute provided in pertinent part:

### EXEMPTION

"Sec. 703. This title shall not apply * * * to a religious corporation, association, or society." 1964 Legis.Hist. at 3035.

Senate debate on the various proposals extended until June 17, 1964, when the Senate invoked cloture and adopted the Humphrey-Dirksen substitute. 110 Cong.Rec. 14239 (1964). H.R. 7152 as modified by the substitute was passed by the Senate on June 19, 1964. 110 Cong.Rec. 14511 (1964). Upon being returned to the House, the Humphrey-Dirksen substitute with its limited exemption for religiously affiliated institutions was passed without House amendment on July 2, 1964. 110 Cong.Rec. 15897 (1964). President Johnson signed the Civil Rights Act the same day. 110 Cong.Rec.

17783 (1964). As enacted, the text of the relevant part of the Civil Rights Act of 1964 was as follows:

### EXEMPTION

"Sec. 702. This title shall not apply * * * to a religious corporation, association, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, or society of its religious activities or to an educational institution with respect to the employment of individuals to perform work connected with the educational activities of such institution." Civil Rights Act of 1964, Pub.L. No. 88–352, § 702, 78 Stat. 255 (1964).

The legislative history of the 1972 amendment to § 702 further elucidates the limited scope of the religious exemption. The Equal Employment Opportunity Act of 1972 effected a substantial revision in Title VII of the Civil Rights Act of 1964, and formulation of the religious exemption received extensive attention on the Senate floor after the relevant bill, S. 2515, had been reported out of committee. Senators Ervin and Allen proposed Amendment No. 815 which would have completely exempted religious organizations from the coverage of the Act.[24] In the following colloquy with Senator Williams, Senator Ervin described the sweeping character of his proposal:

"Mr. Williams. Does the Senator's amendment limit itself to the opportunity of a religious organization to have the right to hire people of its own faith? Is that the limitation of the amendment?

24. Amendment No. 815 read as follows:

"On page 33, strike out everything from the word 'or' on line 20 through the word 'activities' on line 24 ["or to a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its religious activities"], and insert the following in lieu thereof: 'or to the employment of any individuals by any educational institution or by any religious corporation, association, or society.'" S. 2515, 92d Cong. 2d Sess., Amendment No. 815 (1972) in EEOC, Legislative History of Titles VII and XI of Civil Rights Act of 1972 at 881 (1972) ("1972 Legis.Hist.").

The text of § 702, amended by Ervin's proposal, would have read in relevant part:

"Sec. 702. This title shall not apply * * to the employment of any individuals by any educational institution or by any religious corporation, association, or society."

"Mr. Ervin. I would allow the religious corporation to do what it pleased. That is what my amendment would allow it to do. It would allow it liberty. It would take it out from under the control of the EEOC entirely.

\*　　\*　　\*　　\*　　\*　　\*

"I am trying to take the political hands of Caesar off all religious corporations, off all religious associations, and off all religious societies. I am trying to take them even off the National Council of Churches.

"Mr. Williams. Does the Senator deal with any activity that a religious organization might be engaged in—any activity?

"Mr. Ervin. Any activity." EEOC, Legislative History of Titles VII and XI of Civil Rights Act of 1972 at 1229–1230 (1972) ("1972 Legis.Hist.").

A short while later, expressing opposition to Ervin's proposed amendment, Senator Williams explained that it would expand the

exemption for religious organizations in two ways:

"Mr. Williams. \* \* \* This amendment broadens the present exemption of section 702 of Title VII in two respects. Section 702 now exempts religious organizations employing individuals of a particular religion for religious activities and provides an exemption for the educational activities of educational institutions.

"This amendment would allow religious organizations and educational institutions a complete exemption from Title VII coverage. A religious organization would be exempt whether or not it is engaged in religious activities; and the present authority to hire employees of a particular religion, for religious activities would be expanded to include race, color, sex, or national origin for any activity." 1972 Legis.Hist. at 1249–1250.[25]

By a vote of 55 to 25, the Ervin-Allen amendment was defeated in the Senate. 118 Cong.Rec. 1995 (1975).[26]

---

**25.** Senator Williams' objections to a blanket exemption from Title VII for religious organizations are also worth noting here.

"As to religious organizations, it is not clear to me that the religious integrity of these institutions would be compromised by equal employment opportunities for employees in positions unrelated to religious activities of such institutions.

"It should be emphasized that religious corporations and associations often provide purely secular services to the general public without regard to religious affiliation, and that most of the many thousands of persons employed by these institutions perform totally secular functions. In this regard, employees in these 'religious' institutions perform jobs that are identical to jobs in comparable secular institutions. It seems appropriate, therefore, that these persons employed by religious corporations and associations should be given the same equal employment opportunities as those persons employed in comparable positions by secular employers." 1972 Legis.Hist. at 1250.

**26.** The only legislative history which Press has been able to cite in support of its position that it is exempt from EEOC regulation is the following colloquy between Senators Williams and Ervin concerning the Ervin-Allen amendment:

"Mr. Williams. Does the Senator deal with any activity that a religious organization might be engaged in—any activity?

"Mr. Ervin. Any activity.

"Mr. Williams. \* \* \* Let us hypothesize a situation in which a religious order has a distillery and produces an alcoholic beverage. Would the Senator say that business activity of the religious order should be wholly exempt from the provisions or would he say it cannot discriminate because of a person's race, religion, color, or sex?

"Mr. Ervin. I think section 702 in the bill would exempt it if it used the alcoholic beverage for the purpose of communion.

"Mr. Williams. I am certain that is true." 110 Cong.Rec. 1982 (1964).

This colloquy appears restricted to a church's requirement for participation in its "religious order," a group of individuals whose employment is based on life-time vows or some other religious commitment distinguishable from a secular employment contract. Senator Williams' concession that a church could establish its own regulations for a religious order producing wine for communion is a non-concession. Under this Court's construction of the original exemption as well as the present exemption, a religious order in recognition of the tenets of the faith of its church can establish whatever restrictions it desires with regard to employment in that order, be they based on race, color, sex or national origin, regardless of whether its products are marketed commercially. If they are sold commercially, the order may be subject to other government regula-

Subsequently, the Senate considered another Ervin amendment which would have broadened the scope of § 702 only slightly. The Senate adopted this amendment which permitted religious organizations to discriminate on the basis of religion in hiring for all—and not just religious—activities.[27]

Although the language of the amended version of § 702 is no more explicit than the earlier version in limiting a religious organization's right to discriminate only with regard to an employee's religion, the process and result of Senate deliberation emphasize the restrictive scope of the exemption. Presented with a proposal of a two-faceted expansion to § 702, the Senate refused to accept it. Faced with the opportunity of approving just one of the expansions, the Senate took it. Certainly, it is a permissible inference that rejection of the Ervin-Allen amendment is attributable to Senate disapproval of the proposal to allow religious organizations to discriminate on grounds other than religion.

There are several final indications in the legislative history which demonstrate that § 702 is not to be read so broadly as to exempt religious organizations with regard to discrimination based on race, color, sex or national origin. The conference committee report which was adopted gave the following comment on § 702:

"The Senate amendment eliminated the present exemption from Title VII for educational institutions. Also, the Senate provision expanded the exemption for religious organizations from coverage under this title with respect to the employment of individuals *of a particular religion* in all their activities instead of the present limitation to religious activities. The House bill did not change the existing

exemptions. The House receded." H.R. Rep. 92–899, 92d Cong., 2d Sess. (1972), reprinted in 1972 Legis.Hist. at 1836 (emphasis added).

The conference report was adopted by both chambers. 1972 Legis.Hist. at 1853–1854 (Senate), 1872–1875 (House).

Finally, in a section-by-section analysis submitted in the Congressional Record after adoption of all the 1972 changes, Senator Williams offered what is perhaps the most clear expression of an affirmative intention of Congress to grant jurisdiction to the EEOC over charges of discrimination brought against religious organizations on any basis other than an employee's religion. Senator Williams stated:

"The limited exemption from coverage in this section for religious corporations, associations, educational institutions or societies has been broadened to allow such entities to employ individuals of a particular religion in all their activities instead of the present limitation to religious activities. *Such organizations remain subject to the provisions of Title VII with regard to race, color, sex or national origin.*" Section-by-Section Analysis of H.R. 1746, the Equal Employment Opportunity Act of 1972, reprinted in 1972 Legis.Hist. at 1844–1845 (emphasis added).

█ In summary, this Court finds the language as well as the legislative history of § 702 are unmistakably clear that under Title VII Press can exercise only a preference for coreligionists and that Title VII does grant to the EEOC jurisdiction over charges of sexually based discrimination arising from the employer-employee relationship between Tobler and Press.[28] The

tions; however, the mere commercial sale does not subject the order to government restrictions with regard to its employer-employee relationship.

27. Amendment 809 merely struck the adjective "religious" modifying the word "activities" in § 702. *See* Amendment No. 809 to S. 2515, 92d Cong., 2d Sess. (1972), reprinted in 1972 Legis. Hist. at 789. For Senate passage of this second amendment, *see* 118 Cong.Rec. 7170 (1972).

28. Two of the three courts which had discussed the applicability of Title VII to charges of sex and racial discrimination prior to issuance of the *Catholic Bishop* test indicated that Congress did not intend by its adoption of § 702 to exempt religious organizations from Title VII's prohibition against discrimination on those grounds. *See McClure v. Salvation Army*, 460 F.2d 553, 558 (5 Cir.) (dictum), *cert. denied*, 409 U.S. 896, 93 S.Ct. 132, 34 L.Ed.2d 153 (1972);

merits of Press's First Amendment defense to the exercise of this regulatory jurisdiction must now be considered.

## II.  *First Amendment Defenses*

### A.  *Free Exercise Defense*

■ Defendant Press argues that, when application of Title VII collides with a "truly religious course of conduct," one which constitutes an alleged exercise of religion, the exercise of religion must prevail over any implementation of the statute.  Press invokes the free exercise clause to protect this asserted religiously based conduct and not its right to hold a specific religious belief.  Press argues that all the activities carried on at its Mountain View plant constitute an exercise of religion and, more particularly, that the discharge of Tobler was the exercise of a specific belief that adherents of the Seventh-day Adventist faith are not to instigate or continue civil action against the church.  Presumably, Press relies on the former for immunity from all facets of this litigation, including the claims for damages based on its former head-of-household compensation practices, and on the latter only to defeat jurisdiction over claims based on Tobler's retaliatory discharge.  Since Press admits that the doctrine of the Seventh-day Adventist Church incorporates the principle of equal pay, Press cannot rely on an alleged exercise of any specific religious belief to immunize its head-of-household compensation practices from EEOC scrutiny.

Case law has long drawn a distinction between the absolute freedom to hold religious beliefs and the freedom of conduct based on religious beliefs, which latter freedom may be curtailed in some circumstances for the protection of societal interests.  The distinction reflects the judgment that while the state should not pry into individuals' minds or dispense benefits according to citizens' religious beliefs, at the same time acts harmful to society should not be immune from prohibition merely because the actor asserts religious inspiration.  This principle was stated by the Supreme Court in *Cantwell v. Connecticut*, 310 U.S. 296, 303–304, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940):

> "The constitutional inhibition of legislation on the subject of religion has a double aspect.  On the one hand, it forestalls compulsion by law of the acceptance of any creed or the practice of any form of worship.  Freedom of conscience and freedom to adhere to such religious organization or form of worship as the individual may choose cannot be restricted by law.  On the other hand, it safeguards the free exercise of the chosen form of religion.  Thus the Amendment embraces two concepts,—freedom to believe and freedom to act.  The first is absolute but, in the nature of things, the second cannot be.  Conduct remains subject to regulation for the protection of society.  The

*National Organization for Women, Inc. v. President and Board of Trustees of Santa Clara College*, 16 F.E.P. Cases 1152, 1156 (N.D.Cal. 1975).  *See also Whitney v. Greater New York Corporation of Seventh-day Adventists*, 401 F.Supp. 1363 (S.D.N.Y.1975), which, without any discussion of § 702 or of the applicability of Title VII, denied a motion, based on constitutional grounds, to dismiss a complaint filed by a Caucasian female secretary alleging discriminatory discharge because of her social relationship with a black male.

In *McClure*, a decision rendered prior to the adoption of the 1972 amendments to § 702, a Salvation Army minister charged that the organization violated Title VII by paying her less than male ministers.  After stating that § 702 indicates that religious organizations are covered by Title VII except with regard to the exercise of discrimination on the basis of an em-

ployee's religion, the Court proceeded to find constitutional infirmities in applying Title VII to the particular facts involved, namely, the regulation of the employment between a church and one of its ministers, a relationship not at issue in *EEOC (Tobler Charges)*.  460 F.2d at 560–561.

In the third case, one involving a female teacher's Title VII sex discrimination complaint against a Baptist college, *EEOC v. Mississippi College*, 451 F.Supp. 564 (S.D.Miss.1978), *appeal docketed*, No. 78–3123 (5 Cir. Sept. 15, 1978), the court held that the statute was not applicable relying on § 702.  Because the exemption does not appear to be applicable to the facts as given and the court's discussion of cases dealing with the First Amendment issue, rather than the applicability of Title VII, is less than persuasive, this Court chooses not to follow the result reached in that case.

freedom to act must have appropriate definition to preserve the enforcement of that protection. In every case the power to regulate must be so exercised as not, in attaining a permissible end, unduly to infringe the protected freedom." (Footnote omitted.)

*See also Wisconsin v. Yoder*, 406 U.S. 205, 219–220, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *Braunfeld v. Brown*, 366 U.S. 599, 603–604, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961); *Reynolds v. United States*, 98 U.S. 145, 166–167, 25 L.Ed. 244 (1878).

This proposition has been repeatedly applied. For example, a state's child-labor law may take precedence over the right of a child to exercise his religion by selling religious literature. *Prince v. Massachusetts*, 321 U.S. 158, 170, 64 S.Ct. 438, 88 L.Ed. 645 (1941). The refusal to comply with the Equal Pay Act may not be justified on religious grounds, *Marshall v. Pacific Union Conference of Seventh-day Adventists*, 14 EPD ¶ 7806 at 5957–5958 (C.D.Cal.1977), nor may the failure to comply with the federal minimum wage law, *Mitchell v. Pilgrim Holiness Church Corp.*, 210 F.2d 879, 884 (7 Cir.), *cert. denied*, 347 U.S. 1013, 74 S.Ct. 867, 98 L.Ed. 1136 (1954), or the refusal to pay federal income taxes, *Parker v. Commissioner*, 365 F.2d 792, 795 (8 Cir. 1966), *cert. denied*, 385 U.S. 1026, 87 S.Ct. 752, 17 L.Ed.2d 674 (1967). Such regulation of conduct will be countenanced if it impinges on free exercise freedoms only when the government demonstrates a compelling state interest which outweighs the inhibition of the religiously based conduct. *Wisconsin v. Yoder, supra*, 406 U.S. at 221–229, 235–236, 92 S.Ct. 1526; *Gillette v. United States*, 401 U.S. 437, 462, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971); *Sherbert v. Verner*, 374 U.S. 398, 406–409, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963).

In the instant case, the Court has no doubt that there is a compelling public interest in applying the requirements of Title VII to the employment relationship between Tobler and Press that outweighs the assertion by Press that the pervasively religious nature of its activities or the exercise of its particular religious belief prohibiting civil suits immunizes its employment practices from EEOC regulation. In fact, as EEOC has contended, there are several different interests that cumulatively outweigh the infringement alleged by Press.

First is the interest of all individual employees of religiously affiliated organizations in the protection of their statutory right to employment free from sexual, racial, or ethnic discrimination and the utilization of the relief mechanisms embodied in Title VII without fear of reprisal. The earlier discussion of legislative history has already shown the importance Congress attached to extending equal employment opportunity as mandated by Title VII even to employees in religious organizations. Congressional recognition of employees' interests in proceeding to have the merits of a Title VII claim decided without retaliation is embodied in § 704(a), 42 U.S.C. § 2000e–3(a). Section 704(a) has two provisions. The first protects general "opposition" to unlawful employment practices. The second, which covers Tobler's "opposition" to Press's allegedly discriminatory practices, protects specific forms of petitioning the government to end an unlawful practice, e. g., making a charge, testifying, assisting, or "participat[ing] in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). Courts have distinguished the degree of protection given by the two provisions. Individual conduct under the first proviso, general opposition to an unlawful employment practice, must meet a balancing test, *Hochstadt v. Worchester Foundation*, 545 F.2d 222, 230–231 (1 Cir. 1976), whereas those forms of conduct in which Tobler engaged and which are covered by the second proviso are *absolutely* protected.

Additional decisions have emphasized the great importance to society of protecting use by individuals of the procedures Congress designated to vindicate equal employment rights in order to effectuate a statutory scheme which relies largely on just such individual willingness to file charges. *See, e. g., Pettway v. American Cast Iron Pipe*

*Co.*, 411 F.2d 998, 1005 (5 Cir.), *rehearing denied*, 415 F.2d 1376 (1969); *Mead v. U. S. Fidelity & Guaranty Co.*, 442 F.Supp. 114, 15 EPD ¶ 7885 at 6404 (D.Minn.1977). *Cf. Mitchell v. DeMario Jewelry Co.*, 361 U.S. 288, 292, 80 S.Ct. 332, 4 L.Ed.2d 323 (1960) (recognition of importance of proscription against retaliation in § 15(a)(3) of the Fair Labor Standards Act, 29 U.S.C. § 215(a)(3)). Allowing retaliation to go unremedied in this instance would also defeat the EEOC's interest in being able to administer its statutory mandate. To allow a free exercise defense to the retaliation and discriminatory pay practices alleged in this case would mean that no regulation of employment conditions by any governmental agency will be effective at any of the Seventh-day Adventist affiliated institutions nationwide which engage in printing; lumber, wood products, and furniture manufacturing; food processing; and other diverse activities which may have a secular component or which may employ individuals performing purely secular functions such as those Tobler was assigned.

Particularly with regard to its formulation of a broad free exercise defense based on its assertion that all its activities constitute religiously based conduct, Press has misconceived who it is that must make the decisions regarding any conflict between government regulation and the free exercise of religion. In this nation, religious freedom is recognized by the secular adoption of a constitution without which religious freedom would have no meaning. This same document has conferred on the courts the power and responsibility to construe its provisions and protect the violation of the individual rights it creates. Without doubt, the maintenance of an ordered society can and at times does conflict with the practice of certain religious beliefs. In such instances, the courts, and not the church involved, must weigh whether the societal right intrudes on religion in an unconstitutional rather than in a theological sense. It is with this principle in mind that the Court finds no violation of Press's free exercise of religion.

The same principle applies in the following consideration of Press's second First Amendment defense, that EEOC regulation of its activities violates the establishment clause by impinging upon the separation of church and state.

### B. *Establishment Clause*

Defendant Press further argues that since its institutional character is pervasively sectarian, any regulation of its employment practices pursuant to Title VII violates the Establishment Clause as it creates a governmental intrusion fostering impermissible church-state entanglement. EEOC responds that as long as the government action touches only the secular aspects of a religious institution, government regulation is permissible.

Cases interpreting the Establishment Clause have clearly rejected arguments that the First Amendment requires absolute church-state separation and that it bars any contact with government upon a finding that an institution has a religious character. As the Supreme Court explained in *Lemon v. Kurtzman, supra,* 403 U.S. at 614, 91 S.Ct. at 2112, such a requirement would not comport with the realities of modern society:

> "Our prior holdings do not call for total separation between church and state; total separation is not possible in an absolute sense. Some relationship between government and religious organizations is inevitable. *Zorach v. Clauson,* 343 U.S. 306, 312, [72 S.Ct. 679, 96 L.Ed. 954] (1952); *Sherbert v. Verner,* 374 U.S. 398, 422 [83 S.Ct. 1790, 10 L.Ed.2d 965] (1963) (Harlan, J., dissenting). Fire inspections, building and zoning regulations, and state requirements under compulsory school-attendance laws are examples of necessary and permissible contacts. Indeed, under the statutory exemption before us in *Walz* [*v. Tax Commissioner of the City of New York,* 397 U.S. 664, [90 S.Ct. 1409, 25 L.Ed.2d 697] (1970)], the State had a continuing burden to ascertain that the [tax] exempt property [owned by a religious organization] was in fact being used for

religious worship. Judicial caveats against entanglement must recognize that the line of separation, far from being a 'wall,' is a blurred, indistinct, and variable barrier depending on all the circumstances of a particular relationship."

*See also Roemer v. Maryland Public Works Board,* 426 U.S. 736, 745–746, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976) (plurality opinion). In this case, Press does not dispute that it is subject to some governmental regulation in the form of building, zoning, and fire safety laws. Rather, Press argues that the regulation which the EEOC is seeking to implement is more intrusive to the extent that it impermissibly entrenches on church-state separation.

In *Lemon,* the Supreme Court reviewed the criteria for constitutional analysis of such challenges to the separation of church and state. The Supreme Court indicated that to survive constitutional attack a statute challenged on its face or in its application must meet the following three tests:

"First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion, *Board of Education v. Allen,* 392 U.S. 236, 243 [88 S.Ct. 1923, 20 L.Ed.2d 1060] (1968); finally, the statute must not foster 'an excessive government entanglement with religion.' *Walz, supra,* [397 U.S.] at 674 [90 S.Ct. 1409.]" 403 U.S. at 612–613, 91 S.Ct. at 2111.

Here, the first part of *Lemon's* three-prong test is not at issue. Defendant Press does not dispute that Title VII has a secular legislative purpose. It does argue, however, that as applied to Press or any other religiously affiliated organization, Title VII fails the second and third parts of this test.

As to primary effect, the Supreme Court has offered a further enumeration of the factors which are to be considered. In a discussion of a challenged statute granting aid to parochial schools, a discussion which is equally apropos to consideration of regulations alleged to inhibit rather than foster religion, the Supreme Court stated:

"While entanglement is essentially a procedural problem, the primary-effect question is the substantive one of what private educational activities, by whatever procedure, may be supported by state funds. *Hunt* [*v. McNair,* 413 U.S. 734, 93 S.Ct. 2868, 37 L.Ed.2d 923 (1973)] requires (1) that no state aid at all go to institutions that are so 'pervasively sectarian' that secular activities cannot be separated from sectarian ones, and (2) that if secular activities *can* be separated out, they alone may be funded." *Roemer v. Maryland Public Works Board, supra,* 426 U.S. at 755, 96 S.Ct. at 2349 (plurality opinion).

Applying these "primary effect" criteria to Press, this Court finds that Press is not so "pervasively sectarian" as to prevent separation of its secular and sectarian employment functions and that in applying Title VII to Tobler's case, it is only the secular activities which are being regulated.

First, the requirement of separability is satisfied because the aspect of Press which the non-discriminatory and anti-retaliation provisions of Title VII seek to regulate is Press's employment relationship with a lay member of its clerical work force. Tobler's functions, as her supervisor indicated, were chiefly secretarial, and the lesser living allowance which she received was gauged only to her sex and not to any factor related to the administration of a religious activity. For an employee such as Tobler, the employment relationship itself was secular with the exception of the interjection of one religious aspect permissible under § 702 of Title VII. Press could exert a preference for co-religionists and could condition Tobler's continued employment on her membership in good standing in the Seventh-day Adventist church. However, no alteration in Tobler's membership formed the reason for her discharge. Control over this aspect rested not with Press or the General Conference Executive Committee which recommended her discharge but with her local church congregation.

Once this one religious aspect of the employment relationship is isolated, it is clear

that the assertion of EEOC jurisdiction is directed to the secular component of Press's activities in satisfaction of the second prong of the "primary effect" test. Despite the over-arching religious atmosphere Press ascribed to its institution, secular job responsibilities still had to be performed if a product was to be produced, and in fulfilling these functions Tobler received living allowances not based on the nature of her duties or on any contribution she made to the faith but solely on her sex. Applying the requirements of §§ 703(a) and 704(a) to the instant case would not impermissibly inhibit the sectarian components of Press's activities.

Evaluation of the final prong of the *Lemon* analysis, whether application of a statute fosters an excessive entanglement with religion, requires examination of the character and purpose of the institution involved, the nature of the intrusion the state is creating, and the resulting relationship between the government and the religious authority.[29] *Roemer v. Maryland Public Works Board, supra,* 426 U.S. at 748–749, 761–777, 96 S.Ct. 2337 (plurality opinion); *Lemon v. Kurtzman, supra,* 403 U.S. at 615, 91 S.Ct. 2105. Consideration of the character and purpose of the institution with regard to entanglement parallels the analysis applied in determining if an institution is "pervasively sectarian." Once it has been determined, as it has here, that an institution has segregable secular components and that those are what are being regulated, concern over any excessive church-state entangle-

ment that might result from regulating these secular functions is diminished. *Roemer, supra,* 426 U.S. at 762, 96 S.Ct. 2337.

The nature of the intrusion and the possible resulting relationship between the state and the religious institution must in this instance be considered together. Application of Title VII to employment practices would not engage the EEOC in continuous supervision of the defendant's activities. Rather, the EEOC only engages in investigation of institutions after charges have been filed by an employee or by a member of the Commission. § 706(b), 42 U.S.C. § 2000e–5(b). In the exercise of its jurisdiction, the Commission may require that employers produce reports on their employment practices, see § 709(c), 42 U.S.C. § 2000e–8(c); however, orders to produce such information are also subject to challenge under § 709(c) by any religiously affiliated employer who believes the investigation impermissibly crosses into sectarian components of its organization. Once a complaint is filed in federal district court, discovery procedures would be supervised by the court which could be called upon if necessary to restrain overly zealous plaintiff's counsel who might be exceeding the permissible limits under the secular-sectarian distinction.

With regard to the possibility of perpetuating an excessively entangling relationship, it should be noted that the injunctive relief sought in this case is of a narrow

---

**29.** As an adjunct to considering whatever specific administrative entanglement questions are raised by application of the regulatory statute, the Court must also determine whether "[a] broader base of entanglement of yet a different character is presented by the divisive political potential of these * * * programs." *Lemon, supra,* 403 U.S. at 622, 91 S.Ct. at 2115. Questions of such potential for political division along religious lines have arisen in the aid to parochial school cases as a natural outgrowth of citizen disputes over expenditures of limited public funds. In some of the "parochaid" cases, the potential has been found sufficiently great that it contributed to a finding of the state statute's constitutional invalidity, *see, e. g., Meek v. Pittenger,* 421 U.S. 349, 372, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975); *Committee*

*for Public Education & Religious Liberty v. Nyquist,* 413 U.S. 756, 794, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973); *Lemon, supra,* 403 U.S. at 622–624, 91 S.Ct. 2105. In other cases, the potential has been found to be minimal and not of any danger to church-state separation. *See, e. g., Roemer, supra,* 426 U.S. at 765–766, 96 S.Ct. 2337 (plurality opinion); *Tilton v. Richardson,* 403 U.S. 672, 688–689, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971). The factors relevant in such evaluations are sufficiently distinguishable from the instant case involving one sect's objections to governmental regulation to obviate the need to consider this fourth factor. Of more concern here is defendant's claim of excessive administrative entanglement based on the third prong of *Lemon.*

scope.[30] The relationship between Press and the EEOC created by the exercise of the latter's jurisdiction over Tobler's charges could appear to be less entangling than the filing requirements of the tax exemption which was approved in *Walz v. Commissioner, supra*, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697, and by those necessary to guarantee the compliance by the Seventh-day Adventist Church with the Fair Labor Standards Act ordered in *Marshall v. Pacific Union Conference of Seventh-day Adventist, supra*, 14 EPC ¶ 7806 at 5958–5959 & n.3.

The relationship is also less entangling than the state supervisory procedures governing distribution of parochial aid which have already been approved by the Supreme Court. For example, in *Roemer, supra*, the Supreme Court upheld a Maryland statute providing for annual, noncategorical grants to private colleges, including religiously affiliated institutions, as long as the funds, according to a proviso in the statute, not be used for sectarian purposes. The statute authorized the state Board of Public Works to establish procedures for annual filing of itemized reports regarding the recipient institution's use of the governmental aid and for maintenance of records to assist state auditors in checking on the institution's expenditures. 426 U.S. at 741–743, 96 S.Ct. 2337. The Supreme Court rejected an entanglement challenge to the provisions requiring reports and audits, noting that the checks by the state agency were "not

likely to be any more entangling than the inspections and audits incident to the normal process of the colleges' accreditations by the State." *Id.* at 764, 96 S.Ct. at 2353.[31] Similarly, an on-going relationship had been required by the statute which was upheld in *Tilton v. Richardson, supra*, where although the "one-time, single-purpose" construction grant approved there entailed "no continuing financial relationships or dependencies, no annual audits, and no government analysis of an institution's expenditures on secular as distinguished from religious activities," 403 U.S. at 688, 91 S.Ct. at 2100 (plurality opinion), the government retained the right to inspect subsidized buildings for sectarian use. 403 U.S. at 675, 91 S.Ct. 2091. The ongoing church-state involvement mandated by the statutory scheme approved in *Hunt v. McNair*, 413 U.S. 734, 93 S.Ct. 2868, 37 L.Ed.2d 923 (1973), had been even greater. There, the state was actually the lessor of the subsidized buildings, retaining extensive powers to regulate their use. 413 U.S. at 738, 93 S.Ct. 2868. Nonetheless, the statute challenged in *Hunt* was upheld. Here, the accountability of an employer after an employee has filed a charge of discrimination is certainly no greater than that of the religiously affiliated institutions in these three cases.

The type of contacts contemplated by Title VII are to be contrasted as less entangling than those held impermissible in *Wolman v. Walter*, 433 U.S. 229, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1977), and in *Meek v. Pit-*

---

**30.** Although the Court cautions that in some instances broad injunctive relief might infringe on sectarian functions, it is not called upon here to delineate the boundaries of programs that might result in an excessively entangling relationship between church and state.

**31.** The *Roemer* court reached this conclusion despite the similarity between the funding program involved there and the one held unconstitutional in *Lemon*. In invalidating the Pennsylvania state reimbursement program in *Lemon*, the Court had relied upon the unconstitutional degree of administrative entanglement created by the requirement that the schools seeking reimbursement had to maintain accounting procedures that would accommodate state efforts at scrutiny and in particular upon the government's audit power which allowed state

agents to inspect and evaluate a church-related school's financial records to determine which expenditures were religious and which were secular. *Lemon, supra*, 403 U.S. at 620–622, 91 S.Ct. 2105. The Court in *Roemer*, 426 U.S. at 763–765, 96 S.Ct. 2337, noted the similarity between the Maryland and Pennsylvania programs but distinguished *Lemon* as involving elementary and secondary schools in which secular and sectarian components were less separable. This fact "made impossible what is crucial to a nonentangling aid program: the ability of the State to identify and subsidize separate secular functions carried out at the school, without on-the-site inspections being necessary to prevent diversion of the funds to sectarian purposes." 426 U.S. at 765, 96 S.Ct. at 2353.

*tenger,* 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1978), *rehearing denied,* 422 U.S. 1049, 95 S.Ct. 2668, 45 L.Ed.2d 702 (1975). In *Wolman,* the Court considered various facets of an Ohio program of state aid to sectarian schools and invalidated only those forms of aid that, in their integration into the educational process, allowed some room for teacher discretion. With regard to these items, the necessity for the close supervision of the content of daily teaching in order to insure the secular use of funds created an impermissible entanglement. 433 U.S. at 250, 254, 97 S.Ct. 2593. In *Meek,* in rejecting a Pennsylvania statute that authorized the state to supply professional staff to provide counselling, testing, psychological services, and speech therapy to disadvantaged and exceptional students in nonpublic schools, the Court relied upon the fact that furnishing surveillance to guarantee that the teachers would serve a non-ideological role could lead to excessive entanglement. 421 U.S. at 371–372, 95 S.Ct. 1753. The type of on-site supervision necessary in *Wolman* and *Meek* to insure that the teachers would not instill religious beliefs at state expense finds no counterpart in the provisions of Title VII or in the powers of the Commission.[32]

In summary, application of Title VII to the employment relationship between Tobler and Pacific Press does not have the primary effect of inhibiting religion and does not involve the EEOC in unconstitutional administrative entanglement with religion.

**32.** Similarly, the nature of the intrusion and the relationship created by EEOC jurisdiction over Press's secular employee is less entangling than that held to create a "significant risk" of excessive entanglement in *Catholic Bishop,* a finding which turned as it did in the parochial aid cases on the nature of the responsibilities performed by the teacher in a religious school. One commentator has aptly distinguished the entanglement involved in labor-management supervision of parochial teachers from that involved in other regulatory schemes:

"The parochial school teacher cases do not fit into the line of analysis applied in cases like *Mitchell, Marshall* and *Prince* because the NLRA does not intrude on the freedom of

## C. Defense Based on Prohibition of Civil Court Involvement in Ecclesiastical Intra-Church Disputes

Finally, defendant Press argues that its employment dispute with Tobler, particularly the issue of her discharge, is one over which this court as a civil tribunal cannot assert jurisdiction without violating both religion clauses by interposing its judgment in a matter of ecclesiastical cognizance. In response, plaintiff contends that the matters before this Court are of secular concern and, therefore, do not require a decision which would interfere with ecclesiastical governance.

Press relies principally upon *Serbian Orthodox Diocese v. Milivojevich,* 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976), in which the Supreme Court invoked the doctrine of civil non-intervention in church disputes to reject a defrocked bishop's objection to his ouster by the highest body of the Serbian Orthodox church and to reorganization of the American-Canadian diocese by this same tribunal. In a brief concluding paragraph, the Court summarized the non-intervention doctrine as follows:

" * * * [T]he First and Fourteenth Amendments permit hierarchical religious organizations to establish their own rules and regulations for internal discipline and government, and to create tribunals for adjudicating disputes over these matters. When this choice is exercised and ecclesiastical tribunals are created to decide disputes over the government and direction of subordinate bodies, the Constitution requires that civil courts

religion as minimally as the FLSA or the child labor laws. None of these statutes contemplates the broad regulatory framework that is established by the NLRA. The detailed proscriptions and adjudicative processes necessary to regulate collective bargaining are simply not germane to the issues of minimum and equal wages or of the protection of child workers." Comment, The Free Exercise Clause, the NLRA and Parochial School Cases, 126 U.Pa.L.Rev. 631, 688 (1978).

The distinction applies as well, if not with even more force, to EEOC regulation of Press' employment practices with regard to secular employees.

accept their decisions as binding upon them." 426 U.S. at 724–725, 96 S.Ct. at 2387–2388.

In *Milivojevich*, there was no dispute that the church involved was anything but a hierarchical church and that the sole power to remove clerics rested with the decisional body which had decided the bishop's case, *id.* at 715, 96 S.Ct. 2372, nor was there a question, in the opinion of the Court, that the matter at issue was a religious dispute of ecclesiastical concern, *id.* at 709, 96 S.Ct. 2372. The Illinois Supreme Court, which had held in favor of the defrocked bishop, also agreed with these conclusions but had ruled in his favor because it found the church's adjudicatory procedures had been applied in an "arbitrary" manner. *See* 60 Ill.2d 477, 328 N.E.2d 268, 281–282 (1975). In reversing, 426 U.S. at 713, 96 S.Ct. 2372, the Supreme Court rejected this exception to the doctrine of non-intervention in church disputes, an exception which had been established in dictum almost fifty years earlier. *See Gonzalez v. Archbishop*, 280 U.S. 1, 16, 50 S.Ct. 5, 74 L.Ed. 131 (1929). The Court also reversed the Illinois court's disapproval of the diocesan reorganization, ruling that the state court's decision had impermissibly relied on its "delv[ing] into the various church constitutional provisions" relevant to "a matter of internal church government, an issue at the core of ecclesiastical affairs." 426 U.S. at 721, 96 S.Ct. at 2386. The Court noted that the "constitutional provisions of the American-Canadian Diocese were not so express that the civil courts could enforce them without engaging in a searching and therefore impermissible inquiry into church polity." *Id.* at 723, 96 S.Ct. at 2387.

By contrast, at issue in Tobler's case is regulation of the employment of a secretary performing secular functions. The relationship of clerical personnel to a religious employer does not involve ecclesiastical concerns which civil courts are barred from considering by the First Amendment. *Whitney v. Greater New York Corporation of Seventh-day Adventists*, 401 F.Supp. 1363, 1368 (S.D.N.Y.1975). This relationship is to be distinguished from that of a church and its minister, one of prime ecclesiastical concern not constitutionally subject to regulation under Title VII. *McClure v. Salvation Army*, 460 F.2d 558, 560–561 (5 Cir.), *cert. denied*, 409 U.S. 896, 93 S.Ct. 132, 34 L.Ed.2d 153 (1972). *Cf. Simpson v. Wells Lamont Corp.*, 494 F.2d 490, 493–494 (5 Cir. 1974) (rejecting minister's challenge under 42 U.S.C. §§ 1981, 1982, 1983, 1985, and 1986 to his discharge and eviction from parsonage on grounds that matter was ecclesiastical question which civil court was barred from evaluating under the First Amendment).

Nor has the Court ignored claims that Tobler's discharge was in response to her actions contravening Seventh-day Adventists doctrine proscribing civil litigation against the church. However, no matter how inviolate might have been her local church's right to discipline her for her disobedience, that was not the action that was taken. First, this case does not involve a church with a hierarchical polity,[33] and therefore, does not fit precisely into the line of intra-church dispute cases culminated by *Milivojevich*. Yet, even assuming *arguendo* that with regard to some matters the Seventh-day Adventist Church does retain ele-

**33.** This conclusion is supported not only by the testimony of Rittenhouse and Tobler, *see* p. 1297, *supra*, but by statements on church polity contained in the *Manual* and *Encyclopedia* which Press offered as evidence in the case. No "searching and therefore impermissible inquiry into church polity" was required. *Milivojevich, supra*, 426 U.S. at 723, 96 S.Ct. at 2387. Justice White's brief concurrence in *Milivojevich* suggests such as independent determination by a court as to whether it is in fact confronted with a decision by an ecclesiastical tribunal is certainly proper:

"Major predicates for the Court's opinion are that the Serbian Orthodox Church is a hierarchical church and the American-Canadian Diocese, involved here, is part of that Church. These basic issues are for the courts' ultimate decision, and the fact that church authorities may render their opinions on them does not foreclose the courts from coming to their independent judgment. I do not understand the Court's opinion to suggest otherwise and join the views expressed therein." 426 U.S. at 725, 96 S.Ct. at 2388 (White, J., concurring).

ments of a hierarchical structure, the issue of the disciplining of members is one entrusted to the local congregation. Furthermore, the action taken here was not even one of the recognized forms of church discipline. Tobler was discharged from her secular duties at Press, not expelled from the church or censured. The body decreeing this "discipline" was not Tobler's local church but the Executive Board of Press, acting pursuant to a recommendation of the General Conference Committee.

In conclusion, the goals furthered by cases which have long recognized the impermissibility of civil court interference in intra-church schisms, namely the separation of church and state and the free exercise of religion, are not thwarted by this Court's decision on a secular employment matter. The decision does not interfere with the "constitutional mandate that civil courts are bound to accept the decisions of the highest judicatories of a religious organization of hierarchical polity on matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law." *Milivojevich, supra*, 426 U.S. at 713, 96 S.Ct. at 2382.[34]

### III. *Tobler's Claims*

■ Having rejected defendant's First Amendment defenses, this Court must address the merits of the discriminatory pay

and retaliation claims. It is undisputed that Press is an employer engaged in an industry affecting commerce as defined by § 701(b), (g), and (h), 42 U.S.C. § 2000e(b), (g), and (h), and that Tobler is an employee within the meaning of § 701(f), 42 U.S.C. § 2000e(f). *See McClure v. Salvation Army, supra,* 460 F.2d at 557. In addition, it is stipulated that EEOC exhausted all applicable administrative remedies and procedural requirements with respect to the individual discrimination claims asserted on behalf of Tobler.

The claim of discrimination in the payment of household allowances is brought under § 703(a)(1), 42 U.S.C. § 2000e–2(a)(1), which provides in pertinent part:

"(a) It shall be an unlawful employment practice for an employer—

"(1) * * * to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."

Plaintiff has established a *prima facie* case of sex discrimination under § 703(a)(1) as to the payment of household allowances. Defendant has failed to produce a nondiscriminatory reason justifying the different pay practices. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–803, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

**34.** This Court rejects defendant's fourth, and most sweeping, constitutional defense. In asserting it, Press relies principally upon *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), in which the Supreme Court found the wage and hour provisions of the Fair Labor Standards Act constitutionally inapplicable to the states. From *Usery*'s conclusion that the Tenth Amendment protects the states from exercises of the commerce power which trench upon the functions of the states, Press extracts the broader rule "that all of the Bill of Rights protects the intended beneficiaries of its several provisions against all exercises of federal power (without 'balancing'), even those specifically granted in the body of the Constitution. Opening Post-Trial Memorandum for Defendant on Religious Freedom Issues, filed June 27, 1978, at p. 17.

Such extrapolation ignores the fact that *Usery* involved regulation solely of state and not of private activity and that, accordingly, concerns of federalism, absent from Press's

case, formed the primary basis for the Court's holding. *Usery* simply does not allow the blanket prohibition against all regulation of the "intended beneficiaries" of the Bill of Rights which Press urges.

While it is true that an exercise of the commerce power may not impinge on liberties protected by the First Amendment to an extent greater than required by a compelling state interest or to a degree which fosters excessive entanglement of church and state, any allegations of such impermissible encroachment are not to be unquestioningly accepted. Rather, they are to be evaluated pursuant to the well-established tests this Court has laid out above. *See Marshall, supra*, 14 EPD ¶ 7806 at 5957–5959; *Mitchell, supra*, 210 F.2d at 882–885. By the mode of analysis it adopted in *Catholic Bishop* subsequent to *Usery*, the Supreme Court indicated that First Amendment challenges to the exercise of the commerce power were to be accorded such thorough scrutiny.

The burden of proof requirements established in *McDonnell Douglas* have been held to govern retaliation cases. *See, e. g., Corley v. Jackson Police Department*, 566 F.2d 994, 998–999 (5 Cir. 1978); *Smith v. Union Oil Co.*, 17 FEP Cases 960, 995–996 (N.D. Cal.1977); *EEOC v. Kallir, Phillips, Ross, Inc.*, 401 F.Supp. 66, 70 (S.D.N.Y.1975). This Court has already found that Press's termination of Tobler was in retaliation for Tobler's filing charges with the EEOC and intervening in the EEOC action seeking preliminary relief.[35] Press has failed to come forward with a legitimate, nondiscriminatory explanation for its conduct. Accordingly, it is appropriate that Tobler should receive damages based on both claims brought on her behalf.

## RELIEF AND DAMAGES

There remains the question of what relief is appropriate under the remedial provisions of Title VII, specifically § 706(g), 42 U.S.C. § 2000e–5(g), which grants the federal courts broad discretionary power to "order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay  *  *  *, or any other equitable relief as the court deems appropriate."

As relief, the EEOC seeks on Tobler's behalf restitution for the head-of-household allowances she was denied, back pay which has accrued since her discharge, and "front pay" in lieu of her reinstatement to her former position at Press. EEOC urges that the damages awarded for past compensation be corrected for an "inflation factor" or, alternatively, be increased by simple interest of seven per cent.

The parties have stipulated that the sum of $3,164 represents the amount Tobler would have received if she had qualified for the head-of-household allowances Press denied to her but paid to similarly situated males during a period extending from approximately 1970 until July 1973, when Press changed its employee compensation policies. Tobler is entitled to receive $3,164, increased by the "adjusted prime interest rate" adopted below.

Tobler also seeks damages she sustained because of her wrongful discharge. It is unquestioned that as a matter of relief she is entitled to be made whole for any losses resulting from her dismissal.[36] It is equally clear that a back pay award such as that Tobler is seeking should constitute " 'an integral part' " of such relief.[37] Here, Tobler seeks back pay for a period beginning June 1, 1975. The parties had stipulated $26,407 as the net amount of wage losses sustained by Tobler as of February 28, 1978. *See* p. 1301, *supra*.

■■■ What is in dispute is whether Tobler's wage loss should be further reduced to reflect "amounts earnable with reasonable diligence." *See* § 706(g), 42 U.S.C. § 2000e–5(g). In Title VII cases, the burden is upon the defendant to prove any failure by the discriminatee to mitigate

---

**35.** Such conduct is a *prima facie* violation of § 704(a), which provides in relevant part:

"It shall be an unlawful employment practice for an employer to discriminate against any of his employees  *  *  *, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

**36.** *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *EEOC v. Steamfitters Local 638*, 542 F.2d 579, 590 (2 Cir. 1976); *cert. denied*, 430 U.S. 911, 97 S.Ct. 1186, 51 L.Ed.2d 588 (1977).

**37.** *Inda v. United Airlines, Inc.*, 405 F.Supp. 426, 433 (N.D.Cal.1975), *aff'd* 565 F.2d 554 (9 Cir. 1977), *quoting Pettway v. American Cast Iron Co.*, 494 F.2d 211, 252 (5 Cir. 1974). In *Albemarle Paper Co., supra*, the Supreme Court set forth the standards a district court should apply in awarding back pay to employees who "have lost the opportunity to earn wages because an employer has engaged in an unlawful discriminatory employment practice." 422 U.S. at 408, 95 S.Ct. at 2367. The Court stated that the back pay provision must be implemented in a way that is "consonant with the twin statutory objectives" of "eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination." 422 U.S. at 421, 95 S.Ct. at 2373 (footnote omitted).

damages. The defendant must establish the following:

"(1) that the damage suffered by plaintiff could have been avoided, *i. e.,* that there were suitable positions available which plaintiff could have discovered and for which he was qualified; and (2) that plaintiff failed to use reasonable care and diligence in seeking such a position. *See Kaplan v. Intern. Alliance of Theatrical, etc., supra,* 525 F.2d at 1363 [9 Cir. 1975] [other citations omitted]." *Sias v. City Demonstration Agency,* 588 F.2d 692, 696–697 (9 Cir. 1978).

Here, defendant argues that Tobler's wage loss claims should be reduced by fifty per cent because she failed to exercise reasonable diligence in obtaining employment which would mitigate her damage claims against Press. Specifically, defendant contends this failure is demonstrated by the fact that Tobler did not obtain part-time and then full-time secretarial employment until 1½ years and 2½ years, respectively, after her discharge; that her assumption of full-time work coincided with the depletion of her accumulated savings and severance pay; that she presented documentary evidence of interviews with only three prospective employers after she returned in August, 1975, from her trip to visit her husband in Europe; and that she "apparently went out of her way to volunteer information to potential employers" such as her exercise of her Title VII rights, her availability initially only for temporary work, and her unwillingness to work on

Friday evenings and on Saturdays "which made her less than attractive as a prospective full-time employee."

Tobler's efforts in seeking similar employment prior to her obtaining part-time work in the fall of 1976 and full-time work in January 1978 cannot be characterized as overwhelming.[38] However, defendant has provided no evidence that would contradict Tobler's testimony about her efforts in checking want ads, registering with employment agencies, and discussing employment openings with acquaintances nor which would indicate additional opportunities Tobler might have pursued. Defendant has not shown that "plaintiff failed to use reasonable care and diligence" in seeking alternate employment.[39]

■ Defendant contends Tobler's back pay award should be further reduced by an amount of $4,712.16 representing severance pay granted to Tobler upon termination of her employment at Press. EEOC agrees that if Tobler were to be reinstated, the severance pay should be credited against the back pay. However, EEOC argues that if the Court does not order reinstatement, Tobler should be permitted to retain the severance pay. EEOC contends the evidence gives no indication as to what are the practices of Press when a person with seniority comparable to Tobler's is terminated. Since Press is being ordered to offer Tobler "front pay" in lieu of reinstatement, *see* p. 55, *infra,* it is unnecessary to consider

---

38. *See* pages 1300–1301, *supra.* Efforts indicating not much more diligence than that of Tobler have been found to represent sufficient mitigation by the discriminatee. *See Inda v. United Airlines, Inc., supra,* 405 F.Supp. at 432, 435, aff'd 565 F.2d at 562; *Sprogis v. United Airlines, Inc.,* 517 F.2d 387, 392–393 (7 Cir. 1975).

39. In support of its argument that Tobler failed to mitigate damages, Press cites 3 CCH Labor Law.Rept. ¶ 2765.423 for authority that "when comparable employment cannot be found, reasonable diligence requires one to seek and obtain employment which is not necessarily comparable to the job previously held." Post-Trial Brief for Defendant on Damage Issues, filed June 2, 1978, at 6. This proposition is distilled from court decisions construing the obligations

of discharged employees in cases arising under the National Labor Relations Act. While decisions under that Act may provide guidance in uncharted areas of Title VII construction, since, as the Supreme Court has indicated, the legislative history of Title VII makes it clear that "[t]he back pay provision was expressly modeled on the back pay provisions of the National Labor Relations Act," *Albemarle, supra,* 422 U.S. at 419, 95 S.Ct. at 2372, it is clear that there is adequate Title VII authority construing the mitigation provision of § 706(g) to make resort to National Labor Relations Act precedents unnecessary. In any event, the work Tobler sought and ultimately obtained was "not necessarily comparable" to the job she held at Press.

whether equity requires a credit for severance pay against back pay in instances in which reinstatement is denied. When reinstatement is ordered, a credit for severance pay is clearly necessary to prevent an inequitable double recovery by the discriminatee. *Laugesen v. Anaconda Co.*, 510 F.2d 307, 317 (6 Cir. 1965). Since the purpose of the "front pay" award in this case is to place Tobler in the same position as if she had been reinstated, the Court finds a credit for severance pay is appropriate.

■ Tobler testified that she received approximately four weekly payments of unemployment benefits of $89 each. Although neither party has discussed the effect Tobler's receipt of public assistance funds should have on her recovery, the issue should be addressed. Relying principally upon the collateral source doctrine and the idea that public assistance payments are designed to effectuate an independent social policy, some courts considering the question have adopted the NLRB practice, approved in *NLRB v. Gullet Gin Co.*, 340 U.S. 361, 364–365, 71 S.Ct. 337, 95 L.Ed. 337 (1951), of refusing to order deductions of unemployment compensation payments from backpay. *See, e. g., Scofield v. Bolts & Bolts Retail Stores, Inc.*, 20 EPD ¶ 30,242 at 12,302 (S.D.N.Y.1979); *Abron v. Black & Decker Manufacturing Co.*, 439 F.Supp. 1095, 1115 (D.Md.1977); *Inda v. United Airlines, Inc., supra*, 405 F.Supp. at 435. On the other hand, the Court of Appeals for the Second Circuit has held it is within the discretion of the trial court to deduct such payments from the award of back pay. *See EEOC v. Enterprise Association Steamfit-*

*ters, supra*, 542 F.2d at 591–592. The court reasoned that not to order a set-off when state unemployment benefit schemes are funded completely by employer contributions [40] would grant double recovery to the discriminated while assessing the employer a duplicative penalty. Other courts have ordered a deduction for unemployment benefits but without explanation. *See, e. g., Ostapowicz v. Johnson Bronze Co.*, 541 F.2d 394, 401 (3 Cir. 1976); *Bowe v. Colgate-Palmolive Co.*, 416 F.2d 711, 721 (7 Cir. 1969); *EEOC v. Kallir, Philips, Ross, Inc., supra*, 420 F.Supp. at 924. Recently a third approach has evolved which relies upon the existence of a state statutory requirement that any employee who receives a back pay award must repay all benefits to the state fund. *See, e. g., Pedreyra v. Cornell Prescription Pharmacies, Inc.*, 465 F.Supp. 936, 19 EPD ¶ 9,009 at 6,228 (D.Colo.1979), *citing Dow Chemical Co. v. Watts*, No. 76–M–1130 (D.Colo.1977), and *Calbert v. Rocky Mountain Osteopathic*, No. 75–M0709 (D.Colo. 1976).

Although California does not have a comparable statutory requirement mandating employee refunds,[41] recent decisions of the California Unemployment Insurance Appeals Board have required employees to refund unemployment benefits to the state upon reinstatement and receipt of back pay awards after resolution of their employment disputes. *See In re Crockett*, No. P–B–128, Case No. 71–6708, Feb. 17, 1972; *In re Goding*, No. P–B–47, Case No. 69–933, July 15, 1969.[42]

The Court believes similar obligations should be placed upon successful Title VII

---

**40.** California's Unemployment Fund is funded solely by employer contributions and does not include payments deducted from employee salaries. *See* Cal.Unemp.Ins.Code § 976. Separate accounts are maintained for each employer and the accounts are charged for benefits paid to former employees. *See* Cal.Unemp.Ins.Code § 1026.

**41.** Section 1375 of the California Unemployment Insurance Code provides:

"Any person who is overpaid any amount as benefits under this part is liable for the amount overpaid unless:

"(a) The overpayment was not due to fraud, misrepresentation or wilful nondisclosure on the part of the recipient, and

"(b) The overpayment was received without fault on the part of the recipient, and its recovery would be against equity and good conscience."

**42.** The Court does not believe that the fact that these decisions specifically required reinstatement before requiring such repayment makes them inapplicable to the instant case. Here, the award of "front pay" is intended as an equivalent substitute for the relief plaintiff would gain from reinstatement.

plaintiffs. Although mindful of the fact that the collateral source doctrine evolved in part as recognition of uncompensated collateral losses suffered by discharged employees and aware that Tobler no doubt suffered such damage, the Court believes the limited nature of the public fisc and the demands placed upon it by increasing unemployment mandate Tobler's repayment of benefits to the California Employment Development Department.

Finally, the Court must decide whether the back pay amount owed to Tobler net of her severance pay award and unemployment benefits should be increased by either a simple interest percentage figure or should somehow be corrected to reflect the depreciation in the purchasing power of the dollar which has occurred since her discharge. Press argues for the former, noting that the weight of authority requires application of a six per cent simple interest figure. As indicated *supra* at p. 46, EEOC suggests application of an "inflation factor" based upon the Bureau of Labor Statistics Consumer Price Index or, in the alternative, an award of seven per cent simple interest on the back pay grant. As support for the request for an inflation correction factor, EEOC relies upon several recent decisions ordering the upward adjustment of attorneys' fee awards to account for inflation. *See Parker v. Califano*, 443 F.Supp. 789, 793 (D.D.C.1978); *Lockheed Minority Solidarity Coalition v. Lockheed Missiles & Space Co., Inc.*, 406 F.Supp. 828, 834 (N.D.Cal.1976). EEOC also contends that the willingness of the courts to incorporate estimates of future changes in the purchase power of money in awarding prospective damages in recent Federal Tort Claims Act cases, *see Steckler v. United States*, 549 F.2d 1372, 1378 (10 Cir. 1977); *United States v. English*, 521 F.2d 63, 74 (9 Cir. 1975), makes it even more compelling that inflation be taken into account when the damages are retrospective and easily calculable by the parties.

The Court finds the holdings in the attorneys' fee cases inapposite to the instant facts. There, the inflation factor was applied to encourage continued and qualified representation of Title VII plaintiffs, an independent social policy not involved in Tobler's case. Presumably, a Title VII litigant's feelings of deprivation by discrimination and self-interest in litigation are strong enough to prompt utilization of the statutory relief mechanisms without a need to ensure that any potential recovery will be adjusted for inflation.

While the Court can sympathize with Tobler's concern about the deflated value of her recovery and recognizes that even an increase in interest rates applied to damage awards would not offer relief equivalent to that granted through application of the Consumer Price Index, it finds the weight of existing authority favoring the application of interest to Title VII awards too great to be ignored. *See* B. Schlei and P. Grossman, Employment Discrimination Law (1976) at 1258 and 1979 Supplement at 338 and numerous cases cited therein. In addition, the Court notes that the existence of a large number of Consumer Price Indices reflecting differences in geographical and labor markets would make application of the "inflation factor" administratively difficult and might create an additional cause for litigation. Adoption of one interest figure to apply nationally to all occupations on a uniform basis will facilitate delivery of relief.

The Court is concerned, however, that application of an unvarying interest rate of six or seven per cent in times of accelerating inflation may not have any effect in deterring discrimination or ensuring prompt implementation of restitutionary orders. In this regard, the Court notes with approval the recent decision of the National Labor Relations Board in *Florida Steel Corp.*, 231 NLRB No. 231, 1977–78 CCH NLRB ¶ 18,-484 at 30,714 (1977), to apply the sliding interest scale charged or paid by the Internal Revenue Service on the underpayment or overpayment of federal taxes to back pay awards. This scale is tied directly to the private money markets and is subject to

periodic adjustment.[43] The same reasons the NLRB found persuasive for utilizing the IRS rate, namely "encouraging timely compliance with Board Orders, discouraging the commission of unfair labor practices, and more fully compensating discriminatees for their economic losses," 1977–78 CCH NLRB ¶ 18,484 at 30,714, are equally applicable to awards of back pay under Title VII. Therefore, the Court shall order Press to pay back pay computed in accordance with this opinion, with interest to accrue commencing with the last day of each calendar quarter of the back pay period on the total amount then due and owing at the "adjusted prime interest rate" then in effect and continuing at such rate, as modified from time to time by the Secretary of the Treasury, until compliance with this order.

■ In addition to back pay, EEOC seeks in lieu of reinstatement an award of six months' "front pay" to compensate Tobler for lost reinstatement rights and for the future disparity between what she can earn in her present job or in any new career and the higher rate of pay she would otherwise enjoy given her fifteen years of seniority at Press. EEOC contends that in instances in which reinstatement is denied, "front pay" constitutes neither a fine nor a penalty, but rather that it operates as an equitable substitute of monetary or injunctive relief deterring employers who might seek to profit by making reinstatement impossible and vindicating the public and private rights reinstatement usually serves. In response, Press objects to any award of front pay noting that the protracted and complicated nature of the litigation in this and the three related cases has served as a sufficient deterrent to future improper employer action, that Tobler has had adequate time to find other employment, and that the severance pay she received served the same purpose as any award of front pay.

There is no doubt that reinstatement is an inappropriate remedy in this case. The antagonism that has been generated by the litigation and the likelihood that the litigation will not end with the issuance of this opinion force this conclusion. In instances in which it has been decided that an effective employment relationship could not be reestablished, the courts have excluded reinstatement from the forms of relief granted a successful Title VII plaintiff. *See, e. g., EEOC v. Kallir, Philips, Ross, Inc., supra,* 420 F.Supp. at 926–927; *Hyland v. Kenner Products Co.,* 11 EPD ¶ 10,926 at 7,912–7,913 (S.D.Ohio 1976). *Cf. Burton v. Cascade School District No. 5,* 512 F.2d 850, 853 (9 Cir. 1974) (per curiam), *cert. denied,* 423 U.S. 839, 96 S.Ct. 69, 46 L.Ed.2d 59 (1975) (given community disruption which might result, reinstatement denied plaintiff-teacher who prevailed in § 1983 suit challenging her discharge for homosexual preference); *N.L.R.B. v. King Louie Bowling Corp. of Missouri,* 472 F.2d 1192, 1193 (8 Cir. 1973) (although held not improper for district court to order reinstatement, question raised whether more appropriate alternative relief might be fashioned given deterioration of employee-manager relationship); *Combes v. Griffin Television, Inc.,* 421 F.Supp. 841, 846–847 (N.D.Okl.1976) (reinstatement denied successful plaintiff in Age Discrimination in Employment Act case).

Several of these same courts have recognized, however that it would be unjust to deny reinstatement without offering some quantum of monetary relief or "front pay" as a substitute.[44] This alternative relief has

---

**43.** Specifically, under § 6621(c) of the Internal Revenue Code, the "adjusted prime rate" to be used by the Internal Revenue Service is defined as "90 percent of the average predominant prime rate quoted by commercial banks to large businesses, as determined by the Board of Governors of the Federal Reserve System," rounded off to the nearest full percent. The Secretary of the Treasury is to adjust the rate not more than once every two years to reflect money market changes. The adjusted rate is to be announced by October 15 of any year to take effect the following February 1.

**44.** The discretion granted district courts under § 706(g) of Title VII, 42 U.S.C. § 2000e–5(g), subsumes the power to adjust the termination date of a back pay award to comport with equitable considerations. The concept of granting "front pay" apparently evolved from exercise of this discretion in cases in which discriminatees had illegally been denied promo-

been deemed necessary not only to grant discharged employees a reasonable opportunity to find comparable employment, *EEOC v. Kallir, Philips, Ross, Inc., supra,* 420 F.Supp. at 927; *Hyland, supra,* 11 EPD ¶ 10,926 at 7,912, but also to deter future improper employer action. *Burton, supra,* 512 F.2d at 854. Although in the lengthy period since her discharge Tobler has succeeded in obtaining fulltime employment, her salary is significantly less than she would be earning were she still employed at Press.[45] In addition she is not receiving fringe benefits such as health insurance or contributions to a retirement fund from her present employer. The Court is also not convinced that the "front pay" would fail to have useful deterrent effect beyond that created by the prospect of protracted litigation. For these reasons, the Court finds EEOC's request for six months' "front pay" to be a reasonable one that should be granted.

Based upon the foregoing Findings of Fact and Conclusions of Law,

IT IS HEREBY ORDERED that judgment shall be entered in favor of plaintiff.

IT IS HEREBY FURTHER ORDERED that counsel for plaintiff shall prepare an appropriate form of judgment in accordance with this Memorandum of Opinion and submit it to the Court for execution within ten (10) days hereof.

IT IS HEREBY FURTHER ORDERED that the parties shall file briefs with regard to the effect of this decision on pending motions for summary judgment in Case No. C–78–1090–CBR within twenty (20) days hereof. The parties shall thereafter have five (5) days to file reply briefs and a hearing on those motions will be held at 9 A.M. on Thursday, January 31, 1980.

tion to allow them to receive the salary differential to which they were found to be entitled until a date subsequent to the judgment when they could be elevated to their "rightful place" without unjustly ousting other more senior employees who had been innocent bystanders. *See* discussion in Employment Discrimination Law, *supra,* at 1240–1243, and in 1979 Supplement at 335.

**45.** The approximately $4,700 Tobler received in severance pay while beginning to compensate her for her collateral losses, cannot be considered a "make whole" remedy for her continued loss in income.